## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| College Democrats of North Carolina, Zayveon Davis, Zach Powell, Rose Daphne, and Raquel Nelson, | **Case No. 1:26-cv-92** |
| Plaintiffs, | |
| v. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| North Carolina State Board of Elections; Sam Hayes, *in his official capacity as Executive Director of the North Carolina State Board of Elections*; Francis X. De Luca, *in his official capacity as Chairman of the North Carolina State Board of Elections*; Stacy Eggers IV, *in his official capacity as Secretary of the North Carolina State Board of Elections*; Robert Rucho, Jeff Carmon, and Siobhan O'Duffy Millen, *in their official capacities as members of the North Carolina State Board of Elections*; Jackson County Board of Elections; Bill Thompson, *in his official capacity as Chairman of the Jackson County Board of Elections*; Wes Hanemayer, *in his official capacity as Secretary of the Jackson County Board of Elections*; Roy Osborn, Jay Pavey, and Betsy Swift, *in their official capacities as members of the Jackson County Board of Elections*; Guilford County Board of Elections; Eugene Lester III, *in his official capacity as Chairman of the Guilford County Board of Elections*; and Carolyn Bunker, Felita Donnell, Kathryn Skeen Lindley, and Peter Francis O'Connell, *in their official capacities as members of the Guilford County Board of Elections*, | |
| Defendants. | |

Plaintiffs College Democrats of North Carolina, Zayveon Davis, Zach Powell, Rose Daphne, and Raquel Nelson, by and through their undersigned attorneys, file this Complaint for Declaratory and Injunctive Relief against Defendants, and allege as follows:

## NATURE OF THE ACTION

1. Contrary to the views of Defendant Eugene Lester, the Guilford County elections board chair, voting is a *right* of citizenship—not a privilege. This case is about targeted efforts to place additional, unnecessary, burdensome, and ultimately unjustifiable obstacles between students at three North Carolina universities—including the nation's largest historically Black university—and this fundamental constitutional right.

2. Western Carolina University ("WCU"), North Carolina A&T State University ("NC A&T"), and the University of North Carolina at Greensboro ("UNC-G") together serve over 40,000 students. For multiple election cycles, those students have been able to vote early at early voting sites on their campuses. Having that on-campus access has been no mere convenience—it has been critical for overcoming the barriers that student voters face when they attempt to access the franchise, including lack of personal transportation, unfamiliarity with off-campus geography, demanding class and work schedules that leave little time for travel, and limited financial resources. For many students, on-campus early voting enables access to the franchise.

3. Moreover, because same day voter registration is available at early voting sites and not election day polling sites, the on-campus accessibility was critical to ensuring not only that registered voters were able to vote, but that young North Carolinians who

2

were voting for the very first time or updating their voter registration were able to do so in time to participate in the state's elections.

4.     But on January 13, 2026—just a month before early voting begins for the 2026 primary elections—North Carolina election officials stripped away this access for students at these three universities. Along the way, state and county officials brushed aside urgent warnings that their decisions would disproportionately burden young and Black voters and denigrated students who advocated for their rights.

5.     These closures intentionally target the rights of young voters. At WCU, the on-campus early voting site has served the highest proportion of same-day registrants of any site in all of North Carolina—a clear indicator of young, first-time voters exercising their rights. In 2024, it served the second youngest average pool of voters of any site in the state and more Black voters than every other Jackson County site. Now, the nearest early voting site is nearly two miles from WCU's campus in an area with virtually no public transportation options or reliable taxis or ride sharing services to access it. As a result, students who do not have access to private transportation must now walk that distance— which includes walking along a highway that lacks any pedestrian infrastructure—to exercise their right to vote.

6.     Similarly, for students at NC A&T and UNC-G in Guilford County, the closures will force travel to off-campus sites, imposing burdens in time, money, and effort that will fall heaviest on students with the least resources, the least mobility, and the least experience navigating obstacles to voter participation. Those burdens are especially salient at NC A&T, the nation's largest historically Black college or university, where the

3

elimination of a critical on-campus early voting site evokes painful echoes of North Carolina's long and well-documented history of erecting barriers to Black political participation.

7. The justifications offered for these closures are as troubling as they are thin. Guilford County officials cited low turnout and claimed resources would be better spent on communities deemed more politically engaged, a characterization that is especially fraught for students at NC A&T and UNC-G, both of which serve large numbers of Black voters. Meanwhile, officials in Jackson County cited cost savings and logistical issues that simply don't hold up to scrutiny. Lacking any legitimate justifications for the closures, state and county election officials flippantly dismissed student concerns by declaring that university students are "adults" who are too capable and mobile to need voting sites on campus.

8. Worse still, the on-campus early voting sites were the *only* such sites that were closed in these counties. Their removal was not the product of a neutral or uniform reduction in early-voting opportunities. As one State Board member recognized, it reflected a "pattern" of targeted efforts to curtail access to early voting for young voters specifically, a population that has historically depended on campus sites to participate in elections.

9. Crowds of students confronted the election boards to defend their right to access the franchise. They wrote letters that were left unread. They engaged in protest that went unheard. And their demands for transparency were met with patronizing hostility— including open threats to call law enforcement.

4

10. The First and Fourteenth Amendments prohibit states from erecting needless barriers to the franchise that further no state interest. "It is beyond cavil that voting is of the most fundamental significance under our constitutional structure." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (internal quotation marks and citation omitted). And the Twenty-Sixth Amendment prohibits states from "den[ying] or abridg[ing]" the "right of citizens of the United States, who are eighteen years of age or older, to vote" by specifically targeting young voters for unequal treatment based on age. U.S. Const. amend. XXVI.

11. Plaintiffs College Democrats of North Carolina, Zayveon Davis, Zach Powell, Rose Daphne, and Raquel Nelson therefore seek declaratory and injunctive relief to restore on-campus early voting at WCU, NC A&T, and UNC-G before early voting begins on February 12, 2026, and to vindicate the constitutional rights of young voters to participate equally in North Carolina's democracy.

## PARTIES

12. College Democrats of North Carolina ("CDNC") is a nonprofit social welfare organization based in Raleigh, North Carolina. It is the official collegiate arm of the North Carolina Democratic Party and the second largest chartered federation of College Democrats. CDNC has more than 1,500 members at colleges and universities across North Carolina, including 109 members at WCU and 95 members at UNC-G. The mission of CDNC is to facilitate student participation in the democratic process by providing voter registration assistance, organizing voter mobilization efforts, disseminating information about elections and candidates, and ensuring that students across North Carolina's colleges and universities have accessible opportunities to vote. The elimination of on-campus early

5

voting imposes severe and concrete burdens on CDNC's members at WCU and UNC-G, many of whom would have voted early at the on-campus site during the March 2026 primary election.

13.     The elimination of on-campus voting sites also inflicts direct and concrete harm on CDNC by frustrating its core mission and diverting substantial organizational resources away from voter education and engagement. The closures have forced the organization to fundamentally restructure its operations. CDNC is now attempting to organize shuttle transportation to off-campus early voting sites near WCU, UNC-G, and NC A&T—a massive undertaking that requires coordinating across three different campuses, fundraising and diverting funds to cover transportation costs, scheduling shuttles around members' varying class and work schedules, and managing complex logistics. This work consumes organizational time, energy, and financial resources that would otherwise be devoted to the organization's core mission of civic education and voter engagement.

14.     Zayveon Davis is a citizen and registered voter in Guilford County, North Carolina, and an enrolled student at NC A&T, where he resides on campus. He is an Andrew Goodman Foundation Ambassador, serves on the Student Development Committee for Exceptional Males in Business, and is president of the NC A&T Society for Human Resource Management chapter. In addition to these leadership roles, he works five days per week on campus in the Office of Leadership and Civic Engagement, leaving him with limited flexibility to travel off campus to vote during the early voting period. Accordingly, he would have voted at NC A&T's on-campus early voting location to cast

6

his ballot in the March 2026 primary election and the fall general election. Mr. Davis does not have a personal vehicle and would need to rely on public transportation, rides from friends, or walking to reach the nearest early voting site. Each of these options requires significant time—time Mr. Davis does not have given his work schedule and leadership obligations. The elimination of on-campus early voting makes it significantly harder for him to vote, forcing him to navigate voting around his work and academic obligations in ways he would not otherwise have to.

15.     Zach Powell is a citizen and enrolled student at WCU. He is the president of the WCU College Democrats and a registered voter in Jackson County, North Carolina. As president of WCU College Democrats, he leads an organization dedicated to promoting civic engagement and voter participation among WCU students. He has previously voted at WCU's on-campus early voting location and planned to do the same for the March 2026 primary election and the fall general election. He does not have a personal vehicle and relied on the accessibility of on-campus early voting to participate in prior elections. As a first-generation college student balancing classes, work, and organizational leadership responsibilities, it was critical that Mr. Powell could use the on-campus early voting site since it was a familiar location where he could vote between classes without the burden of arranging off-campus transportation. The elimination of on-campus early voting forces him to travel nearly two miles to the Cullowhee Recreation Center along a four-lane highway with no sidewalks and no public transportation. Mr. Powell cannot walk this distance safely, and arranging rides or paying for taxi service imposes financial and logistical hurdles that make early voting substantially more difficult for him.

7

16.     Rose Daphne is a citizen and enrolled freshman at WCU, where she resides in on-campus housing. She planned to vote early at the on-campus early voting site during the March 2026 primary and to use same-day registration to update her registration to reflect her current address in Jackson County. She also planned to use the on-campus voting site to vote early in the fall general election. Ms. Daphne does not have a personal vehicle. The elimination of on-campus early voting at WCU forces her to travel nearly two miles to the Cullowhee Recreation Center along a four-lane highway with no sidewalks and no public transportation. As a first-time Jackson County voter, Ms. Daphne must already navigate unfamiliar registration and voting requirements, and the elimination of this site compounds those challenges by forcing her to navigate unfamiliar geography and plan a logistically difficult round trip off campus around her class and extracurricular schedule.

17.     Raquel Nelson is a citizen and enrolled student at UNC-G, where she resides in on-campus housing. Ms. Nelson is a first-time voter and planned to vote at the on-campus early voting site during the March 2026 primary and the fall general election. Ms. Nelson does not have a personal vehicle and as an out-of-state student from Washington, does not have family who reside in North Carolina that can provide her with transportation to other early voting sites. In fact, Ms. Nelson is not aware of which early voting site is closest to UNC-G. The campus site has also served as an information hub for her and her peers about where and how to vote, and its elimination leaves her without a clear or accessible point of guidance for navigating the voting process. Ms. Nelson must now overcome increased barriers to voting that she did not expect to encounter during her first opportunity to make her voice heard at the ballot box.

8

18.    Defendant the North Carolina State Board of Elections is the state agency with "general supervision over the primaries and elections in the State." N.C. Gen. Stat. § 163-22(a). This includes approving early voting plans. N.C. Gen. Stat. § 163-166.35(a), (e).

19.    Defendant Sam Hayes is the Executive Director of the North Carolina State Board of Elections ("NCSBE"). Mr. Hayes is North Carolina's "Chief State Election Official." N.C. Gen. Stat. § 163-82.2. He is sued in his official capacity.

20.    Defendant Francis X. De Luca is NCSBE's chair. He is sued in his official capacity.

21.    Defendant Stacy "Four" Eggers IV is NCSBE's secretary. He is sued in his official capacity.

22.    Defendant Jeff Carmon is an NCSBE member. He is sued in his official capacity.

23.    Defendant Shiobhan O'Duffy Millen is an NCSBE member. She is sued in her official capacity.

24.    Defendant Robert Rucho is an NCSBE member. He is sued in his official capacity.

25.    Defendant Guilford County Board of Elections is a county agency responsible for conducting elections in Guilford County, including adopting early voting plans and establishing early voting sites. N.C. Gen. Stat. § 163-166.35.

9

26. Defendant Jackson County Board of Elections is a county agency responsible for conducting elections in Jackson County, including adopting early voting plans and establishing early voting sites. N.C. Gen. Stat. § 163-166.35.

27. Defendant Eugene Lester III is the chair of the Guilford County Board of Elections. He is sued in his official capacity.

28. Defendant Carolyn Bunker is a member of the Guilford County Board of Elections. She is sued in her official capacity.

29. Defendant Felita Donnell is a member of the Guilford County Board of Elections. She is sued in her official capacity.

30. Defendant Kathryn Skeen Lindley is a member of the Guilford County Board of Elections. She is sued in her official capacity.

31. Defendant Peter Francis O'Connell is a member of the Guilford County Board of Elections. He is sued in his official capacity.

32. Defendant Bill Thompson is the chair of the Jackson County Board of Elections. He is sued in his official capacity.

33. Defendant Wes Hanemayer is the secretary of the Jackson County Board of Elections. He is sued in his official capacity.

34. Ray Osborn is a member of the Jackson County Board of Elections. He is sued in his official capacity.

35. Jay Pavey is a member of the Jackson County Board of Elections. He is sued in his official capacity.

36.     Betsy Swift is a member of the Jackson County Board of Elections. She is sued in her official capacity.

## JURISDICTION AND VENUE

37.     Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation under color of law of rights secured by the U.S. Constitution, specifically by the First, Fourteenth, and Twenty-Sixth Amendments.

38.     The Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343 because the matter in controversy arises under federal law and the Constitution of the United States.

39.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) and (b)(2) because Defendants Lester, Bunker, Donnell, Skeen, Lindley, and O'Connell reside in this district, all Defendants are residents of North Carolina, and a substantial part of the events that gave rise to Plaintiffs' claims occurred in this district.

40.     This Court has the authority to enter declaratory and injunctive relief under Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202.

## STATEMENT OF FACTS AND LAW

**A.      Early Voting and Same-Day Registration in North Carolina**

41.     In North Carolina, eligible voters may cast their ballot in person up to several weeks before Election Day. Ballots cast during early voting are counted the same as ballots cast on Election Day. N.C. Gen. Stat. § 163-166.40(a).

42.     Early voting is widely popular in the state, particularly among students, Black voters, and other voters with constrained schedules and limited access to

transportation. In 2024, North Carolina voters broke a record for early voting, with more than four million North Carolinians casting their ballots before election day using this mechanism for voting.

43.     Early voting is conducted differently from election-day voting. Rather than voting at an assigned polling place, early voters cast their ballots at centralized "early voting sites" located throughout the county and may vote at any such site within their county that is most accessible.

44.     Voters may also take advantage of same-day registration at early voting sites. N.C. Gen. Stat. § 163-82.6. Same-day registration allows an eligible individual to complete a voter registration application and cast a ballot simultaneously, so long as the individual provides proof of residence. This form of registration is particularly critical for young voters on college campuses, who are more likely to be first-time voters or to be registering at a new address.

45.     Same day registration is *not*, however, available at polling sites on election day. So voters who do not register by the regular registration deadline—25 days before the relevant election—*must* avail themselves of early voting if they wish to register and vote in a particular election.

46.     To facilitate early voting, county boards of elections are required to develop a "Plan for Implementation," addressing the details of early voting in the county, such as the number and location of polling sites and their operating hours. N.C. Gen. Stat. § 163-166.35(a). If the county board unanimously approves the plan, it will go into effect. But if the vote is not unanimous, the plan must be submitted to the State Board for approval. *Id.*

12

47.     For the 2026 primary election, the State Board encouraged county boards of elections to submit early voting plans by December 5, with a hard deadline of December 19.

48.     The State Board voted on contested county board plans on January 13, 2026.

49.     Early voting for the March 2026 primary elections in North Carolina is scheduled to begin on February 12, 2026.

**B.     The Jackson County Board votes to eliminate one of the most successful campus early voting sites in the state, at WCU.**

### 1.     Early Voting at Western Carolina University

50.     WCU is the westernmost institution in the UNC public university system, located in Jackson County, North Carolina. The campus sits in a rural, mountainous setting, between the Great Smoky and Blue Ridge mountains.

51.     The school serves over 11,000 students between its undergraduate and graduate programs, more than 71% of whom are between the ages of 18 and 24. Many of these students reside on or near campus during the academic year.[1]

52.     WCU has improved access to higher education for historically underserved populations. In 2024, more than a third of undergraduate students attending WCU were first generation students, many of whom hail from rural communities across Western North Carolina. WCU is also one of only four UNC System schools that participates in the NC

---

[1] *See Fast Facts*, Western Carolina University, https://www.wcu.edu/discover/about/fast-facts.aspx (last visited Jan. 27, 2026).

Promise Tuition Plan, a program designed to improve educational opportunities by significantly reducing North Carolinians' tuition to $500 per semester.

53.     In part because of WCU, the Jackson County electorate is one of the youngest in North Carolina. Seventeen percent of registered voters in the county are under the age of 26—the second highest proportion of young, registered voters per county in the state.

54.     WCU's location in the Appalachian Mountains presents unique challenges for student voters. WCU's rural, mountainous character means that public transportation is extremely limited. WCU's website specifically highlights that public transportation in the area is not well developed and that travel often requires private vehicles or costly alternatives such as taxis.[2]

55.     Approximately 64% of WCU students do not have a car which, combined with the lack of public transportation, makes off-campus travel prohibitive for most students. Although Jackson County transit can, upon request, transport up to 24 students at a time, this requires students to make an appointment at least a day in advance along with payment.

56.     Recognizing these challenges, for nearly a decade, the Jackson County Board of Elections has operated an on-campus early voting site at WCU that student voters have heavily relied on. The WCU on-campus voting site was established in 2016 following significant advocacy from students, university leadership, and the broader community. It

---

[2] *See Arriving at WCU*, Western Carolina University, https://www.wcu.edu/learn/office-of-international-programs-and-services/admitted-students/arriving-at-wcu.aspx (last visited Jan. 27, 2026).

has been used in every general and primary election since it was established, and thousands of votes have been cast there.

57.     The WCU site has been wildly successful in improving youth voter engagement in Jackson County. Before the site opened, Jackson County's youth participation in early voting was just below the statewide average. After the site was established, Jackson County jumped to six percentage points *above* the statewide average, making Jackson County a leader in youth voter participation.

58.     The WCU site also significantly increased same-day registrations. In eight of the last nine elections, the WCU site recorded the highest proportion of same-day registrations anywhere in the state. The only exception was in the 2022 primary, where WCU's voting site had the second highest rate of same-day registrations in the state.

59.     Same-day registration has proven to be critical to enfranchising student voters at WCU. Many of these voters have recently turned 18 and are registering to vote for the first time. Others who were previously registered at home need to update their registrations to their campus addresses to vote in Jackson County.

60.     During the 2024 election cycle, the WCU early voting site served one of the youngest voting populations of any polling site statewide and served more Black voters than every other early voting site in the county combined.

### 2. The Jackson County Board's Vote

61.     On December 9, 2025, the Jackson County Board of Elections, by a 3-2 vote, approved an early voting plan for the March 2026 primary election. In a departure from

nearly a decade of past practice, the plan eliminated the on-campus early voting site at WCU.

62.    At the meeting, Board members and students raised serious concerns about the impact of the closure on student voters. Prior to the vote, students, advocates, and community members spoke overwhelmingly in opposition to eliminating the WCU voting site—21 individuals offered public comment, of which 19 spoke in opposition. One student said that WCU students, staff and community members "find use and need for this polling location" and that taking it away "will turn into a logistical nightmare real fast."

63.    Board member Betsy Swift, who opposed the plan, highlighted that with the removal of the WCU site, the closest early voting location would be nearly two miles away from campus, located along a four-lane highway with no walkable shoulders or sidewalks. She further recognized that eliminating the site would significantly reduce access for a predominantly young and rural population.

64.    Board members who supported removing the WCU site flippantly dismissed these and other concerns. Jackson County Board Chair Bill Thompson suggested that because *he* has never personally felt disenfranchised by the lack of a walkable early voting site, closing the WCU site was not an act of disenfranchisement—further demonstrating the Board's dismissive attitude toward the right of young voters to access the franchise. Chairman Thompson later argued before the State Board that university students are "[not] kindergarteners who need help tying their shoes and opening their milk cartons," but are "adults" who have "demonstrated above-average ability and mobility" and therefore should

16

reasonably be expected to travel to off-campus early voting locations regardless of what transportation options may be available to them.

65.    The Board attempted to explain its decision citing concerns about logistical issues and costs, but neither justification holds water.

66.    On logistical challenges, the Board majority claimed that parking at WCU is inaccessible and confusing to navigate. But WCU has historically offered free, dedicated parking to voters in the parking lot directly outside the door to the voting area. Moreover, WCU provided an additional parking lot for voters, in addition to curbside voting. The specific sites offered for the 2026 primary by WCU are also significantly larger than the one site in the precinct left open—the Cullowhee Recreation Center. Cutting the number of early voting sites in the precinct in half would potentially *double* the traffic to this much smaller facility.

67.    More to the point, eliminating the WCU site will do nothing to improve these claimed accessibility concerns, because the Board is not *replacing* it with another, more accessible site. It is simply eliminating the site altogether.

68.    The Board majority also complained of high costs at the WCU site, later claiming that eliminating the site would save the county $20,000. But minority Board member Ms. Swift demonstrated that the cost savings from eliminating the WCU site would only be approximately $6,000, because of the costs of increasing staffing at the one remaining early voting site in the precinct. Moreover, WCU provides the physical space, IT support, and dedicated parking for the site, further reducing the county's incremental

17

costs. And the Jackson County Board of Elections is not cash strapped—it routinely falls short of its projected spending and returns funds to the county.

69.     Based on these faulty explanations—and its demonstrated contempt for young voters—a majority of the Jackson County Board of Elections voted to eliminate on-campus voting at WCU.

## C.     The Guilford County Board eliminates early voting sites at NC A&T and UNC-G despite high utilization.

### 1.  Early Voting at North Carolina A&T State University

70.     NC A&T, in Guilford County, is the largest historically Black college or university in the United States, with a current enrollment of over 15,000 students.[3]

71.     NC A&T has a long history of political engagement and activism by young, Black North Carolinians. It was established during the days of Jim Crow, when Black North Carolinians were being systematically stripped of their political rights. Despite these obstacles, NC A&T became a center of Black intellectual life, leadership, development, and civic engagement, playing a pivotal role in the Civil Rights Movement. In 1960, four NC A&T freshmen sat down at a whites-only lunch counter in Greensboro, sparking the sit-in movement that spread across the South and helped dismantle Jim Crow segregation.

72.     Today, the overwhelming majority of NC A&T students are Black. The university is an engine of opportunity for young Black North Carolinians, many of whom are first-generation college students. For many of these students, voting in college is their

---

[3] *See* Todd Simmons, *N.C. A&T Is First HBCU Ever to Enroll More Than 15,000 Students*, NC A&T News (Sep. 10, 2025), https://www.ncat.edu/news/2025/09/2025-fall-enrollment.php.

first opportunity to exercise the franchise—a milestone in their civic engagement and a connection to the generations of Black North Carolinians who fought for the right to vote.

73.     Before the 2020 election, NC A&T students had to vote in primary elections at the Old Guilford County Courthouse, requiring nearly an hour of walking roundtrip. But, in 2019, students successfully advocated for an on-campus early voting site due to difficulties accessing the Old Courthouse. In response to this student advocacy, Guilford County approved an on-campus early voting site at NC A&T for the 2020 primary elections.

74.     The hard-won NC A&T on-campus early voting site saw immediate success—students and community members turned out in higher numbers than at other, pre-existing early voting sites, confirming the demand for an on-campus voting location to serve the student population. And more than 70% of students participated in the 2020 election—a huge jump from under 60% student voting in 2016.

## 2. Early voting at the University of North Carolina at Greensboro

75.     UNC-G is a public university located in Guilford County, North Carolina, serving over 18,000 students, many of whom reside on or near campus during the academic year.[4]

76.     Like NC A&T, the Guilford County Board of Elections has historically operated an on-campus early voting site at UNC-G that has been used by students and community members since at least 2012.

---

[4] *See UNCG Achieves Highest Enrollment in Four Years*, UNC Greensboro (Sep. 5, 2025), https://www.uncg.edu/featured/uncg-achieves-highest-enrollment-in-four-years/.

19

77.     UNC-G serves a diverse student body including substantial numbers of students of color, first-generation college students, and students with limited financial resources. More than half of the student body identifies as belonging to a racial or ethnic minority group, with nearly 30% identifying as Black.

78.     In recent years, voting has increasingly become a cornerstone of student life at UNC-G. During the 2020 election cycle, 74% of eligible students at UNC-G voted, up an astonishing 17 points from the 57% of eligible students who voted in the 2016 presidential election. Notably, this figure also far exceeds turnout among the U.S. population at large, which had 66% voter turnout during the 2020 presidential election.

### 3.  The Guilford County Board's Vote

79.     On November 18, 2025, the Guilford County Board of Elections, by a 3-2 vote, approved an early voting plan for the March 2026 primary election. In contrast to the 2020 and 2024 primaries, the plan eliminates the on-campus early voting sites at NC A&T and UNC-G.

80.     Though students appeared at the November 18 meeting to advocate for early voting sites at NC A&T and UNC-G, they were barred by the Board's majority from speaking. When Board Member Carolyn Bunker asked that the students be given the opportunity to speak, Defendant Lester refused.

81.     After silencing opposing voices, the Guilford County Board supported its decision to eliminate on-campus early voting at NC A&T by citing low turnout at the campus location and claiming that county resources would be better allocated to communities deemed more politically engaged.

82.     After the hearing, Defendant Lester denigrated the right to vote, asserting that "voting is a privilege," not a right—a statement fundamentally at odds with the Constitution's protection of the franchise.

83.     NC A&T and UNC-G serve tens of thousands of predominantly Black students. The suggestion that these young Black voters are not politically engaged and are less deserving of accessible early voting opportunities carries unmistakable echoes of historical efforts to devalue and suppress Black political participation.

84.     The assertion that young voters at NC A&T and UNC-G are insufficiently engaged to warrant on-campus early voting sites is also demonstrably wrong. In the 2024 general election, 6,800 votes were cast at UNC-G and 6,487 votes were cast at NC A&T. The campus sites ranked approximately midway among Guilford County's 28 early voting sites in turnout—hardly evidence of low engagement or wasted resources.

85.     Moreover, the elimination of on-campus early voting does nothing to address allegedly low turnout. To the contrary, it is more likely to *suppress* voter turnout. When voting is made more difficult and less accessible, fewer people vote—particularly young voters and first-time voters who are still learning to navigate the voting process.

86.     The Guilford County Board's reasoning thus creates a self-fulfilling prophecy: make it harder for students to vote early, then argue that lower turnout justifies making it even harder.

**D.    The State Board rubber stamps the counties' plans to strip early voting access from students.**

87.    Earlier this month, the State Board met to consider both the Jackson County and Guilford County early voting plans, including the eliminations of on-campus early voting at WCU, NC A&T, and UNC-G. Because the County Board votes to approve Jackson County's and Guilford County's plans were not unanimous, under North Carolina law, the State Board had the final say in what plan each county would adopt. *See* N.C. Gen. Stat. § 163-166.35(a).

88.    In a marked departure from past practice, the State Board refused to accept public comment on the plans. Undeterred, scores of students participated in a letter-writing campaign describing the burdens they expected to face if the Board voted to remove the sites. To fill the gap in public input left by the Board's decision to disallow public comment, Guilford County Board of Elections representatives appeared at the meeting and delivered several boxes of letters they received from students and community members alike. Reports indicate that these letters were left "untouched" for the meeting's duration.

89.    Students from these universities also showed up to the meeting in droves— but their advocacy was met with open hostility. Students reported waking up at 5:00 a.m. to make the trip across the state in time for the board's meeting in Raleigh, carrying signs displaying phrases like "Don't take our vote from us." In an early attempt to silence student voices, Defendant State Board member De Luca told the students that signs would be prohibited. He relented only following push back from student leaders and Democratic board members.

22

90.     Despite its refusal to hear from students directly, the State Board was on notice of the disproportionate burdens these eliminations would impose on young voters, including young Black voters. County Board members who opposed the eliminations—including Jackson County Board members Betsy Swift and Roy Osborn and Guilford County Board members Carolyn Bunker and Felita Donnell—presented detailed testimony explaining the severe barriers students would face if the campus early voting sites were eliminated: the lack of public transportation at WCU, the prohibitive distances and costs to reach other early voting sites, the high proportion of students without vehicles, and the discriminatory impact on same-day registrants and first-time voters.

91.     Additionally, before the State Board meeting, 12 major civil rights organizations submitted a detailed letter warning the State Board that the eliminations would "leave historic communities with sizeable Black populations" and students at "the largest historically Black college or university in the nation" without "fair access to early voting sites."

92.     The State Board approved both county plans anyway. The State Board's decisions mean that, for the March 2026 primary election, there will be no early voting sites on campus at WCU, NC A&T, or UNC-G.

93.     In rejecting claims of disenfranchisement, one State Board member wrote off the strenuous and well-documented concerns of students, asserting that students are "very capable individuals . . . some of the best and brightest we have" and therefore "this would not be any impediment to them to exercise their right to vote." These statements reveal the same patronizing dismissiveness that characterized the County Boards' decisions: young

voters' own views are dismissed in favor of assertions about their capabilities, implying that if they cannot overcome the obstacles placed between them and their right to vote, it is because they did not try hard enough.

94.    After the Board concluded its vote on the Guilford and Jackson County plans—having just approved the simultaneous elimination of on-campus early voting at three universities serving predominantly young and Black populations—Board member Millen laid bare what everyone in the room already knew: "on the subject of students . . . we can see a pattern today, can't we?" The pattern was unmistakable: three universities, two counties, one coordinated effort to restrict young North Carolinians' access to voting.

95.    After the meeting, students asked Board members to explain why they voted to remove the on-campus voting sites. Like the County Boards, State Board members patronized students, responding "[Y]ou're not kindergarteners, you can find another place to vote." Defendant De Luca taunted students with a mocking chant of, "I want a site, I want a site." De Luca even resorted to intimidation, threatening to call the Capitol Police on the students.

96.    Ultimately, the State Board knowingly shut their eyes and ears to both data and testimony that would have underscored the burdens on young voters and contradicted the bases for their decision to close the sites. In so doing, Defendants insulated their decisions from scrutiny and demonstrated that the closures were directed at restricting young voters' access to the franchise.

**E.** **The elimination of campus voting locations will severely burden young North Carolinians' access to the franchise.**

97.     Students at WCU, NC A&T, and UNC-G disproportionately rely on on-campus early voting sites because those sites are accessible, integrated into campus life, and facilitate same-day registration and early voting during the academic term.

98.     The elimination of on-campus early voting sites at WCU imposes severe burdens on student voters.

99.     The nearest early voting location to WCU is now 1.8 miles away from campus. WCU is located in rural Jackson County in the Appalachian Mountains, an area with virtually no public transportation infrastructure or reliable taxis or ride sharing services. Students without personal vehicles will be forced to walk approximately 1.8 miles to the nearest early voting site along a four-lane highway with no sidewalks or walkable shoulders, and through an open field. The area is simply not designed for pedestrian travel, raising serious safety concerns for students forced to make the trip on foot.

100.     WCU's website highlights the lack of public transportation, noting that "the public transportation system is not well developed in the mountains, so you need to travel by air or Greyhound Bus to Asheville, NC. You can take a taxi or Shuttle to Western Carolina University." The only alternative option is Jackson County transit, which requires paying a fee and advanced scheduling.

101.     For students who cannot walk the distance—including students with disabilities—the cost and hassle of taking a taxi or shuttle to reach the nearest early voting site may be enough to dissuade them from voting at all. And taxis and ridesharing apps like

Uber and Lyft that are common in more urban areas are highly unreliable, if available at all, in rural Jackson County.

102.    The burdens imposed by the elimination of on-campus early voting sites at WCU will deter students from voting early. For some, particularly those without transportation or those with disabilities, or those who need to be able to access same day registration to be able to register to vote, it may prevent them from voting at all.

103.    The elimination of this site is particularly harmful given the data showing that the WCU early voting site has historically served the highest proportion of same-day registrants in the state, the second youngest average pool of voters in the state, and more Black voters than any other Jackson County voting site.

104.    Students who rely on same-day registration are often first-time voters or students who have recently moved. These voters will now face the additional burden of traveling nearly two miles off campus to register and vote.

105.    The elimination of on-campus early voting at NC A&T and UNC-G likewise imposes severe burdens on student voters.

106.    The closest early voting location to NC A&T and UNC-G is approximately 1.6 miles from each campus.

107.    While NC A&T and UNC-G are located in Greensboro, where public transportation is more available than in rural Jackson County, students still face significant time, financial, and logistical burdens in traveling off campus to vote early.

108.    For the many students without personal vehicles, reaching an off-campus early voting site requires taking public transportation, arranging rides, or walking

26

significant distances. Each of these options imposes burdens in time, money, and effort that students would not face if they could vote early on their own campuses.

109.    The burdens are even more substantial for students with disabilities, who may not be physically able to walk to other voting locations or may require specialized transportation.

110.    For many students balancing work, classes, and other responsibilities, the additional time required to travel off campus is prohibitive.

111.    For students at all three campuses, these burdens fall heaviest on the most vulnerable: those with the least money, those with disabilities, those without access to private transportation, and those least familiar with the area. These are precisely the students for whom on-campus early voting serves the most important function—making voting a simple act of participation rather than a test of determination.

112.    And at NC A&T, where the overwhelming majority of students are Black, and at UNC-G, where the student body is majority-minority, the elimination of on-campus early voting echoes a painful and familiar pattern in a state with North Carolina's history of racial discrimination in voting. *See N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 223 (4th Cir. 2016) ("Unquestionably, North Carolina has a long history of race discrimination generally and race-based vote suppression in particular.").

F.    **Eliminating early voting sites on college campuses does not further any compelling state interest.**

113.    Defendants have failed to articulate any legitimate justification for eliminating on-campus early voting at WCU, NC A&T, and UNC-G.

114.    The justifications offered for eliminating the campus sites—including minimal cost savings, alleged logistical issues, and the suggestion that students are not politically engaged—were repeatedly contradicted by data presented by Board members who opposed the elimination of the on-campus voting sites. *See supra* ¶¶ 62−63, 84.

115.    The claim of low turnout is both false and circular: Turnout depends in part on access, and eliminating access will only depress turnout. These claims are also demonstrably wrong.

116.    NC A&T is a hot bed of campus-level political activity. As the nation's largest HBCU, it is a trailblazer for mobilizing young Black voters. The campus has at least two student organizations—Aggies Activate the Vote and Black Girls Vote—committed to get-out-the-vote programming and otherwise encouraging political participation among the student body. In the 2020 election, 70% of NC A&T students cast a ballot.

117.    UNC-G has also demonstrated impressive voter turnout in recent years, further undercutting the Board's turnout-based rationale for closing the sites. Much like students at NC A&T, UNC-G students have turned out to vote in record numbers after the on-campus site was established: 74% of eligible students voted in the 2020 presidential election, up from 57% in 2016. The school expressly credited a "Walk to the Polls" event highlighting the campus's early-voting site, helping dramatically improve voter turnout.

118.    At WCU, the now-eliminated on-campus voting site had the second highest number of early voters of any site in the county in 2024, as well as the highest proportion of same-day registrants in the entire state—hardly evidence of low engagement.

119. The claim that resources would be better allocated elsewhere is similarly unconvincing. At WCU, the actual cost savings from eliminating on-campus early voting appears to be about only $6,000, and the university provides physical space, IT support, overhead, and dedicated parking, minimizing the county's incremental costs.

120. If resource allocation were truly the concern, the rational approach would be to *maintain* on-campus early voting at these universities, where the institutions absorb much of the costs, rather than forcing students to travel to off-campus sites that require full county funding.

121. The claim that students are too capable or mobile to need on-campus voting amounts to nothing more than patronizing age-based stereotyping, which implies that young voters are expected to overcome barriers that other voters do not have to contend with, and that if they ultimately are unable to overcome them, it is because they did not care enough. It is also contradicted by the realities of student life: limited financial resources, demanding schedules, lack of private vehicles, and unfamiliarity with the local geography.

122. Nor was the decision to close the WCU, NC A&T, and UNC-G sites part of a larger, age-neutral plan that improves access to early voting countywide. The Jackson and Guilford County plans simply close the campus sites without opening new alternatives. And the plans do not close other early voting sites *off* college campuses. The decision is a targeted attempt to limit access to early voting opportunities for young voters *specifically*, who historically frequent campus voting sites.

123.   The real reason for the elimination of on-campus early voting at these universities appears to be a judgment that student voters—and disproportionately Black student voters—do not deserve the same level of accessibility as other voters in their counties. That judgment contradicts the Constitution and basic principles of equal treatment.

## CAUSES OF ACTION

## COUNT I

**Denial or Abridgement of the Right to Vote on Account of Age**
**U.S. Const. amend XXVI, 42 U.S.C. § 1983, 28 U.S.C. § 2201, 28 U.S.C. § 2202**

124.   Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

125.   The Twenty-Sixth Amendment to the U.S. Constitution provides in relevant part: "The right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by . . . any State on account of age."

126.   By prohibiting any abridgment of the right to vote on account of age, the Twenty-Sixth Amendment mirrors the Fifteenth Amendment, which provides that voting rights "shall not be denied or abridged . . . on account of race, color, or previous condition of servitude." U.S. Const. amend. XV, § 1.

127.   Accordingly, at the time the Twenty-Sixth Amendment was adopted in 1971, Congress would have understood its text to have similar scope to the Fifteenth Amendment, which prohibited not only express race-based restrictions, but also facially race-neutral restrictions that were "motivated by a discriminatory purpose." *City of Mobile v. Bolden*, 446 U.S. 55, 62 (1980) (plurality opinion) (citing *Guinn v. United States*, 238 U.S. 347

(1915)), *superseded by statute on other grounds*, Voting Rights Act Amendments of 1982, sec. 3, § 2, 96 Stat. 132, 134.

128. Congress and the courts have also recognized that the Twenty-Sixth Amendment has "particular relevance for the college youth who comprise approximately 50 per cent of all who were enfranchised by this amendment." *Walgren v. Howes*, 482 F.2d 95, 101 (1st Cir. 1973) (citing 117 Cong. Rec. 5817, 5825 (1971) (statements of Sens. Charles Percy and Edward Brooke)).

129. The Twenty-Sixth Amendment therefore not only lowers the voting age to eighteen, but also prohibits age discrimination in voting, including facially age-neutral actions that are motivated by an age-discriminatory purpose. Entry Denying Defendants' Motion to Dismiss at 20–21, *Count Us In v. Morales*, 1:25-cv-00864-RLY-MKK (S.D. Ind. Oct. 14, 2025), ECF No. 57 (noting that when "[a] challenged law is neutral on its face," the relevant inquiry for purposes of the Twenty-Sixth Amendment is "whether invidious discriminatory purpose was a motivating factor," which may be satisfied when legislators explicitly disregard testimony concerning the effects of a law on youth voters); *League of Women Voters of Fla. v. Detzner*, 314 F. Supp. 3d 1205, 1222–23 (N.D. Fla. 2018) (holding plaintiffs were substantially likely to succeed on merits of Twenty-Sixth Amendment claim in challenge to restrictive state guidance that prohibited early voting sites on college campuses, finding the prohibition "unexplainable on grounds other than age because it bears so heavily on younger voters"); *Colo. Project-Common Cause v. Anderson*, 495 P.2d 220, 223 (Colo. 1972) (holding based on "[h]istory and reason" that the Twenty-Sixth Amendment's "prohibition against denying the right to vote to anyone

eighteen years or older by reason of age applies to the entire process involving the exercise of the ballot and its concomitants").

130.    The removal of campus early voting sites from WCU, NC A&T, and UNC-G violates the Twenty-Sixth Amendment by targeting voting sites used predominantly by college students, who are overwhelmingly young. Even worse, all of the eliminated sites serve disproportionately Black and minority voters.

131.    Defendants were on clear notice that the decision to close these early voting sites would disproportionately burden young voters, particularly students. But at every opportunity, they ignored and belittled these concerns. To wit, some board members suggested that the burdens this decision imposed on young voters were a *virtue* of the plan, arguing that college students have "demonstrated above-average ability and mobility," and therefore should not be heard to complain about having to travel to vote. In truth, students are financially strapped, lack access to personal vehicles, are unfamiliar with local geography, and are often voting for the first time in their lives.

132.    The Board members who voted to remove these early voting sites offered no plausible justifications. These decisions are unlikely to significantly reduce costs or logistical burdens, and claims of underutilization of on-campus voting sites are demonstrably false.

133.    The removal of campus early voting sites—and *only* campus early-voting sites—is therefore "unexplainable on grounds other than [age]" and operates as a surgical restriction on young voters' access to early voting opportunities. *See March for Our Lives*

*Idaho v. McGrane*, 749 F. Supp. 3d 1128, 1139−40 (D. Idaho 2024) (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977)).

**COUNT II**

**Undue Burden on the Right to Vote**
**U.S. Const. amends. I & XIV, 42 U.S.C. § 1983, 28 U.S.C. § 2201, 28 U.S.C. § 2202**

134.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

135.    The general "right to vote" is "implicit in our constitutional system." *Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35 n.78 (1973). And the courts afford special protections for this "precious" and "fundamental" right. *Harper v. Va. State Bd. Elections*, 383 U.S. 663, 670 (1966).

136.    Under the First Amendment and the Equal Protection Clause of the Fourteenth Amendment, a court considering a challenge to a state election law must first carefully balance the character and magnitude of the injury to First and Fourteenth Amendment rights that the plaintiff seeks to vindicate against the justifications put forward by the state for the burdens imposed by the rule. *See Burdick*, 504 U.S. at 434; *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). "It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." *Anderson*, 460 U.S. at 789. The court "must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Id*.

137.    A burden on the right to vote need not be insurmountable before it can be deemed to be a severe burden. *See, e.g.*, *Perez-Guzman v. Gracia*, 346 F.3d 229, 241 (1st

Cir. 2003). Election practices imposing severe burdens on the right to vote "[must] be narrowly drawn to advance a state interest of compelling importance." *Norman v. Reed*, 502 U.S. 279, 289 (1992). But even less severe burdens remain subject to balancing: "[h]owever slight" the burden on voting rights may appear, "it must be justified by relevant and legitimate state interests '*sufficiently weighty to justify the limitation*.'" *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (plurality opinion) (emphasis added) (quoting *Norman*, 502 U.S. at 288–89); *see also Eakin v. Adams Cnty. Bd. of Elections*, 149 F.4th 291, 306 (3d Cir. 2025) ("The relevant burden need not be severe" to trigger *Anderson-Burdick* balancing.). In all cases, the question is whether "the proffered State interests justify the burden the [restriction] imposes." *Eakin*, 149 F.4th at 314.

138.    Here, the elimination of early voting sites at WCU, NC A&T, and UNC-G imposes substantial, unjustified burdens on the right to vote for young voters in Jackson and Guilford Counties in several ways. The students who most rely on on-campus early voting sites are less likely to have reliable access to private transportation, have mobility constraints, often juggle busy schedules, and are navigating the voting process for the first time. At WCU, students without cars will be forced to walk almost two miles, along a dangerous highway and across an open field to access the planned early voting site. Students at NC A&T and UNC-G—who are disproportionately Black or persons of color— will similarly be forced to travel more than a mile and a half to reach their closest early voting sites.

139.    On the other side of the *Anderson-Burdick* ledger, Defendants offered no plausible state interest that is advanced by their decision to eliminate campus early voting

sites. Any cost savings are likely to be minimal, as much of the cost of operating these sites was borne by the universities themselves. Eliminating these sites is likely to exacerbate the logistical burdens on election board staff and voters by increasing the volume of voters at the remaining polling sites. And the notion that these early voting sites were under-utilized is simply false.

140. Because these burdens cannot be justified by any legitimate state interests and are certainly not narrowly tailored to serve any compelling state interests, the removal of voting sites at WCU, NC A&T, and UNC-G violates young North Carolinians' right to vote as protected by the First and Fourteenth Amendments.

## **<u>PRAYER FOR RELIEF</u>**

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, and:

A. declare, under the authority granted to this Court by 28 U.S.C. § 2201, that closure of the early voting sites at WCU, NC A&T, and UNC-G for the March 2026 primary election violates the First, Fourteenth, and Twenty-Sixth Amendments to the U.S. Constitution;

B. enjoin Defendants, under the authority granted to this Court by 28 U.S.C. § 2202, from closing the early voting sites at WCU, NC A&T, and UNC-G for the March 2026 primary election or future elections in 2026;

C. award Plaintiffs their costs, disbursements, and reasonable attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988 and other applicable laws; and

D.      grant such other and further relief as the Court deems just and proper.

Dated this 27th day of January, 2026.

Respectfully submitted,

/s/ *Narendra K. Ghosh*
Narendra K. Ghosh
N.C. Bar No. 37649
**PATTERSON HARKAVY LLP**
100 Europa Drive, Suite 420
Chapel Hill, NC 27217
Telephone: (919) 942-5200
nghosh@pathlaw.com

Lalitha D. Madduri*
Richard A. Medina*
Nicole Wittstein*
Julie Zuckerbrod*
Tori Shaw*
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave, N.W., Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
lmadduri@elias.law
rmedina@elias.law
nwittstein@elias.law
jzuckerbrod@elias.law
tshaw@elias.law

* *Notice of Special Appearance Forthcoming*

*Counsel for the Plaintiffs*